# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| JANE DOE, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|   v. | )  Case No. 5:17-cv-12301 |
| | ) |
| ARSENIY BAKHSEHTSYAN, | )  Hon. _____ |
| | ) |
|     Defendant. | ) |
| | ) |
| _____ | ) |

## **Complaint**

Plaintiff, Jane Doe, moves the Court for entry of judgment in her favor against Arseniy Bakhshetsyan, and in support of her Complaint avers as follows:

## **Nature of Action and Jurisdiction**

1.     This action is brought pursuant to 42 U.S.C. § 1983 seeking injunctive relief to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution, retaliating against Plaintiff for her exercise of constitutionally protected speech, interference with her constitutionally protected right to petition the government for redress of injuries, and interference with her constitutionally protected right to privacy.

1

2.     This case arises under the United States Constitution and 42 U.S.C. § 1983 and involves diverse parties and an amount in controversy exceeding $75,000.00. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331, 1332, and 1343. The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202.

3.     Venue is proper under 28 U.S.C. § 1391(b) because, on information and belief, Defendant resides in the Eastern District of Michigan and because the events giving rise to the claims occurred in the Eastern District of Michigan.

## Parties

4.     The foregoing allegations are incorporated as if re-alleged herein.

5.     Plaintiff, Jane Doe,[1] is a private citizen residing outside the State of Michigan.

6.     Defendant, Arseniy Bakhshetsyan is a private citizen who has utilized the courts of the State of Michigan to violate Jane Doe's rights under the First and Fourteenth Amendment of the United States Constitution under color of state law.

---

[1] Plaintiff requests that the Court grant her motion, accompanying this Complaint, to proceed under pseudonym given the utmost intimate nature of the underlying facts of this case and requests that the Court refer to her by the pseudonym "Jane Doe." Defendant is aware of Plaintiff's identity and that she can be reached through undersigned counsel, but out of concern for her safety, Plaintiff would prefer to keep her current location private.

## Facts

7.      The foregoing allegations are incorporated as if re-alleged herein.

8.      The Parties in this case met as students in the Master of Business Administration ("MBA") Program at the Stephen M. Ross School of Business at the University of Michigan in Ann Arbor, Michigan.  Plaintiff Jane Doe ("Jane") had moved cross country, away from most of her family and friends, to embark on her MBA program.

9.      The parties became close friends and engaged in an on-again, off-again romantic and intimate relationship.  Because Jane was living far away from family and friends and did not have a car in Michigan, she relied on Defendant for rides and some support with her apartment and other general activities that friends or family may otherwise provide had the situation been different.  They also traveled together.  All in all, the Parties were quite close and spent significant time together between August 2015 and July 2016.

10.      Although there were several moments when the Parties' relationship was tested over a roughly ten-month period, Jane decided shortly after taking a trip with Defendant to Lake Tahoe in July 2016 that the relationship could not be reconciled and further contact between them would not be healthy.  One of the statements that brought Jane to this conclusion was Defendant's threat that he would end her career and ruin her reputation if she broke off their relationship.

3

**Defendant stalked Jane.**

11.     In mid-July 2016, Jane tried to end the relationship and all contact with Defendant, sending over one dozen messages asking him not to contact her anymore.  Jane then blocked Defendant from her phone.  Undeterred, Defendant flew to Portland, Oregon to appear unannounced at Jane's apartment even though she had told him not to come.  Jane again told Defendant not to contact her anymore.

12.     Over the next month, Defendant continued to send messages via various internet applications demanding to see Jane, even though she had blocked him and continued to try to block the assumed names he used to continue attempting contact.  This prompted Jane to send a final email making clear that if Defendant did not cease and desist any contact with her via any means she would seek legal action and a personal protection order.

13.     Nevertheless, Defendant sent multiple emails to Jane, to which she no longer responded, building up to threats that he would come through on his promise to ruin her reputation and career if she did not talk to him.

14.     Around the same time, Jane began receiving incessant, vulgar, and threatening text messages from unknown or unidentified numbers.  The texts indicated that the sender knew where she was, talked about her sexual behavior,

4

called her lurid and degrading names, and threatened (to cite only two examples) that the sender intended to "kick her ass" or "brake [her] fingers one by one." This continued for months.

15.     Jane could not be sure that these messages were coming from Defendant, but given the timing she suspected that Defendant might be involved. The messages were so shocking and absurd that she sought advice from a few select friends and relatives. Each person with whom she discussed this matter encouraged her to do what she needed to do to be safe and conveyed to her that they believed Defendant was the likely source of the strange and frightening messages.

16.     Over several months, Jane also received a constant battering of calls from "No Caller ID" or unknown numbers, which sometimes came in batches of approximately one hundred calls per hour.

17.     On the day Jane returned to Ann Arbor to begin her second year of the MBA program, Defendant repeatedly arrived at the inside door to Jane's apartment—where she lived alone. To get to the inside door, Defendant would have had to wait by the locked outside doors for someone else to enter or exit. He stopped by and came back in that fashion several times and Jane did not answer her door. Scared, Jane called a mutual friend to try to distract Defendant. Still not deterred, Defendant returned to Jane's apartment.

**Jane asked for help.**

18.     Frightened, Jane called the police and later filed a report regarding Defendant's stalking behavior.   Jane has since cooperated with the ensuing investigation by sharing the myriad crude and vulgar texts that received with detectives at the Ann Arbor Police Department.

19.     The detectives' investigation led to criminal charges.  Detective Renee Bondy was the complaining witness on the Criminal Complaint, dated March 7, 2017.  Defendant was arraigned on March 9, 2017 on several counts, including Aggravated Stalking and Malicious Use of Telecommunications Services.  Jane served as a witness and endured cross examination at Defendant's preliminary exam, and Defendant was bound over to face felony charges in the Washtenaw County Circuit Court on June 14, 2017. (See Exhibit A, Register of Actions.)  The official investigation of this matter has connected Defendant to some of the abusive text messages that Jane received (which appeared to come from unknown or unfamiliar numbers) through phone extraction reports revealing conversations with individuals outside the United States requesting that such individuals send the messages to Jane.

20.     Concerned about having contact with Defendant at the Ross School of Business, which, like many professional schools is housed in one large building, Jane also reported Defendant's behavior to the University of Michigan's Office of

6

Student Conflict Resolution, which triggered a process conducted by the Office for Institutional Equity.  Jane has cooperated with all requests from the University of Michigan in connection with its investigation.

21.    On January 9, 2016, The University of Michigan, Office of Institutional Equity issued a report finding by the preponderance of the evidence that Defendant had stalked Jane. (Exhibit B, OIE Report.[2])  Defendant appealed that decision, and the case was reviewed and recommended returned with no changes by the Honorable Barbara S. Jones, retired judge of the U.S. District Court for the Southern District of New York. (Exhibit C, OIE Appellate Decision.)

22.    For an added measure of safety, Jane sought an ex parte Personal Protection Order ("PPO").  In earlier requests for a PPO, before the Prosecutor filed felony charges against Defendant, the court wanted a hearing before issuing the order in which Jane and Defendant would both be present, and Jane was too weary of Defendant to go through with that.  But after the messages continued and charges were pending, Jane sought and obtained an ex parte PPO.  (See Exhibit D, Personal Protection Order.)

23.    Jane has since graduated with her MBA and would like nothing more than to go on with her life free from contact or association with Defendant.  She

---

[2] The exhibits attached to the report have been omitted at this time because they are voluminous and are summarized by the report itself.

7

has moved several states away and registered her PPO in the state where she is currently residing.

### Defendant used the courts to continue harassing Jane.

24.     In response to Jane's protected speech actions petitioning for redress, Defendant chose to make good on his threat to ruin Jane's reputation and launched what he called a "war" on every legal front imaginable.  But this time, instead of using Instagram or another form of technology to harass Jane, Defendant chose the courts.

25.     Despite the voluminous direct, documentary evidence that he had stalked Jane, Defendant lashed out by filing a frivolous, retaliatory lawsuit in Washtenaw County.  The Complaint carries through the vulgar, demeaning language that was used in the strange messages that Jane received, which called her "fat, a pig, twat, etc."—conveying these slurs to the public record and redoubling the harassment Jane felt in the first place.  Defendant used the Complaint to attack Jane's First Amendment Rights, stating that Jane defamed him when she asked friends for help and sought redress from the police and University. (Exhibit E, Complaint.)

26.     Shortly after filing his lawsuit, Defendant immediately began seeking private information about Jane using the court's discovery process.  Defendant

8

subpoenaing the University of Michigan for Jane's MBA grades.  When

considered in light of Defendant's threat to ruin her career by making reports to the

University, this discovery request was anything but reasonable, but because it

could be framed as having the potential to lead to some relevant evidence, the court

allowed it. (Exhibit F, Subpoena for academic record.)

27.     Since then, Defendant has sought to depose Jane at the earliest date

possible.  Defendant has expressly declined to handle discovery through written

interrogatories and instead seeks to require Jane to travel back to Michigan, endure

more questions into her sexual behavior and romantic relationships, and an

additional forum in which she is forced to relive a the intimate details of a

disturbing and frightening period in her life—all just because she asked for help.

28.     Continuing in his multi-pronged strategy, Defendant also sued the

University of Michigan on May 16, 2017 in the Michigan Court of Claims.  This

additional, baseless lawsuit offers yet another venue through which Defendant

might seek broad discovery about Jane. (Exhibit G, Register of Court of Claims

Action.)

29.     Still not tired of waging "war" through the courts, Defendant filed an

untimely and unfounded motion to "dissolve" the PPO, in which Defendant

belittled the threat posed by stalking and suggested that there was no reason for her

to seek protection because he had not physically harmed Jane.  (Exhibit H, Motion

to Dissolve PPO.)  This motion again utilizes the Washtenaw County Circuit Court as a vehicle by which to contact Jane. Indeed, Defendant has notified the court that he seeks to extensively cross-examine Jane at the hearing set for that motion on August 31, 2017.  Defendant was not satisfied to question Jane over the phone, but instead asked the court to force her to travel in person to endure cross examination about her desire for protection.

30.     Even though Defendant is facing serious felony charges, he has resisted any effort to stay his civil action against Jane.

31.     Defendant's aggressive, litigious actions against Jane are strategically calculated to chill her ability to seek redress, and his suit against the University of Michigan threatens to cut her off from appropriate supports from the University. All of these actions were taken with the intent to prevent Jane from exercising her constitutional right to seek protection from the criminal courts for redress from grievances under the First Amendment and to further limit Jane's substantive due process rights.

**Litigation abuse and strategic lawsuits against public participation turn the courts into a vehicle to chill free speech and invade privacy.**

32.     Defendant is not alone in his efforts to abuse the courts. Victim rights attorneys are seeing this type of abusive and invasive litigation throughout the country giving rise to a significant public policy issue.  If victims will be sued for speaking out, why would they chose to come forward?  Litigation abuse turns the

10

court into a weapon with which to continue harassing and meddling with a target. Scholars and courts have recognized that perpetrators of intimate partner misconduct often engage in litigation abuse. *See, e.g.*, *Schuyler v Ashcraft*, 680 A.2d 765 (N.J. Sup. Ct. 1996) (observing that the abusive motion practice in a family court case "chained" a woman to her former husband and that, "A human being deserves better."); National Council of Juvenile & Family Court Judges, *Batterer Manipulation of the Courts to Further Their Abuse, and Remedies for Judges*, 12 Synergy No. 1 at 12 (2008) accessible at https://www.ncjfcj.org/sites/default/files /synergy-12-1.pdf.

33.     In cases where a personal protection order is in place, like this one, lawsuits represent a back door through which perpetrators can still access and continue to abuse their victims.  See Mary Przekop, *Note: One More Battleground: Domestic Violence, Child Custody, and the Batterer's Relentless Pursuit of Their Victims Through the Courts*, Seattle J Soc J 1053, 1061 (2011) accessible at: http://digitalcommons.law.seattleu.edu/cgi/viewcontent.cgi?article=1045& context=sjsj.

34.     Though misunderstood, stalking is as common as it is tragically dangerous.  A seminal report from the U.S. Department of Justice showed that stalkers victimize 3.4 million men and women each year.  Katrina Baum, *et al*, *Stalking Victimization in the United States*, Bureau of Justice Statistics, Jan 2009.

The vast majority of stalking victims know their stalkers. *Id.* Roughly half of stalking victims felt a "fear of not knowing what would happen next" the behavior might subside, but it also could escalate to violence. *Id.*

35.    Former intimate partners are the most dangerous stalkers. This is because former intimate partners have considerable leverage over their victims as they know a great deal about them and can use that knowledge to be more insulting and threatening. Mohandie, K., R. Meloy, *et. al*, *Typology of Stalking: Reliability and Validity Based Upon a Large Sample of North American Stalkers*, Journal of Forensic Sciences 51 (1) (January 2006): 147-155, *available at* https://victimsofcrime.org/docs/default-source/src/mohandie-k-meloy-r-green-mcgowan-m-_-williams-j-2005.pdf?sfvrsn=2. Intimate partners who stalk are more likely to eventually approach victims physically, to use weapons, and to repeat their menacing behavior. *Id.* Former intimate partners who stalk are also more likely to become lethal faster. *Id.*

36.    Nonetheless, stalking often goes unreported or brushed aside. A study by the U.S. Justice Department found that only one in three cases of stalking is ever reported to police. Baum, *supra*. One reason is that popular culture—from songs across genres to movies—portrays stalking-like behavior as romantic. Michelle M. Garcia, *Voices from the Field: Stalking*, Office of Justice Programs,

12

266 Nat'l Inst Justice j 230413 accessible at

https://www.nij.gov/journals/266/Pages/stalking.aspx#note6.

37.     The underreporting and misconceptions about stalking make Defendant's litigation abuse particularly disturbing.  This case is one of an increasing class that seeks to target (and, if possible, punish) crime victims and witnesses for the act of reporting crimes or cooperating with law enforcement agencies.  Such suits are commonly known as "strategic lawsuits against public participation," or "SLAPP" suits.  *See, e.g.*, *Westfield Partners, Ltd. v. Hogan*, 740 F. Supp. 523, 524–25 (N.D. Ill. 1990); *John v. Douglas County School Dist.*, 219 P.3d 1276, 1280 (Nev. 2009).

38.     These SLAPPs often present themselves as tort suits brought by a criminal defendant against a crime victim who either reported the crime or cooperated with law enforcement in investigating it, but they aim directly to curtail a crime victim's or witness's First Amendment rights to free speech, and to public participation through petitioning the government for redress of grievances.

39.     If Defendant is allowed to continue his litigation "war" against Jane, then future stalking victims could be deterred from reporting and they may suffer—or even die—in silence.

13

40.     These lawsuits turn the court into a vehicle through which a perpetrator may further access and abuse his victim in spite of Michigan's constitutional protections for victims of crime. Const 1963, art 1, § 24.

41.     As the U.S. Department of Justice has observed, "through continuing court dates . . . *the legal system often unintentionally enables stalkers to gain access to the victims or to continue harassing and intimidating them.*"  Michelle M. Garcia, *Voices from the Field: Stalking*, Office of Justice Programs, 266 Nat'l Inst Justice j 230413 accessible at

https://www.nij.gov/journals/266/Pages/stalking.aspx#note6 (emphasis supplied).

**Defendant is using the court to chill Jane's speech.**

42.     A bird's eye view of Defendant's actions (not available to each judge adjudicating the case before him) demonstrates a pattern of using naked allegations and unfounded claims to gain expanded access to his intended victim—Jane.

43.     Despite Jane's fortitude, these lawsuits and litigious actions have, to an extent, had their desired effect:

   a.   Jane has been forced to spend time, energy, and resources dealing with Defendant even though she wanted nothing further to do with him.

   b.   Jane has continuously dealt with the feeling of being under attack and subject to the whim of the person from whom she sought protection.

14

c. Jane has felt intimidated and weary of continuing to participate in the criminal and University processes—notably these are processes that the respective offices, and not Jane, initiated and have continued to pursue.

d. Jane has suffered emotional angst and has felt the need to look over her shoulder—she often wonders if this will ever stop.

## Causes of Action

### Count One: First Amendment Rights Pursuant to 42 U.S.C. §§ 1983, 1988

44. The foregoing allegations are incorporated as if re-alleged herein.

45. Jane's conversations seeking help from friends, family, the police, and representatives of her University are speech protected by the First Amendment of the U.S. Constitution.

46. Jane made such statements in an effort to seek redress from her government and public University to ensure her safety, which is expressly protected under the First Amendment and federal precedent.

47. Defendant has utilized the Michigan courts to act under color of law and continue contact with Jane in an effort to chill her speech by pursuing baseless claims, motions, and by exploiting the discovery process.

48. Defendant acted intentionally and with callous disregard for Jane's clearly established constitutional rights.

15

49.     As a direct and proximate result of Defendant's violations of Jane's constitutional rights, Jane has suffered emotional distress and concern regarding her continued participation in the criminal justice process and the University of Michigan inquiries.

**Count Two: Fourteenth Amendment Rights Pursuant to 42 U.S.C. §§ 1983, 1988**

50.     The foregoing allegations are incorporated as if re-alleged herein.

51.     Jane has a privacy interest in keeping her intimate behavior private and in shielding her reputation from association with the vulgar and lewd language contained in the incessant text messages she received.  By asking for help when she was scared, Jane did not seek to render any of this information public.

52.     Defendant has acted under color of law by using the Michigan courts to invade Jane's privacy by bringing to light intimate details of her life and their relationship in an effort to chill her participation in the various investigations being conducted against him.

53.     Defendant has used his Complaint to associate Jane with the vulgar and inappropriate messages that terrorized her for months.

54.     Defendant acted intentionally and with callous disregard for Jane's clearly established constitutional rights.

16

55.     As a direct and proximate result of Defendant's violations of Jane's constitutional rights, Jane has suffered emotional distress and concern regarding her continued participation in the criminal justice process and the University of Michigan inquiries.

## Prayer for relief.

Wherefore, Plaintiff, Jane Doe, requests judgment against Defendant as follows:

A.     For declaratory relief regarding the unlawful and unconstitutional acts by Defendant;

B.      For injunctive relief directing as follows:

1. That the 22nd Circuit Court for the County of Washtenaw, Michigan, be enjoined from allowing discovery in Defendant's civil action, Case number 17-000191-CZ, until the conclusion and any appeal of Defendant's pending felony trial and any appeal in the case referred to herein, *People v. Bakshetsyan*, believed to be Case Number 17-000417-FH;

2. That the 22nd Circuit Court for the County of Washtenaw, Michigan, be enjoined from allowing any evidentiary hearing on

17

Defendant's untimely motion regarding the Personal Protection order, Case number 17-000853-PP, until the conclusion and any appeal of Defendant's pending felony trial and any appeal in the case referred to herein, *People v. Bakshetsyan*, believed to be Case Number 17-000417-FH; and

3. That the Michigan Court of Claims be enjoined from allowing Defendant to depose Jane as part of his case against the University of Michigan, Case number 17-000134-MM, until the conclusion and any appeal of Defendant's pending felony trial and any appeal in the case referred to herein, *People v. Bakshetsyan*, believed to be Case Number 17-000417-FH.

C. To take pendant jurisdiction over the claims and counterclaims raised in Defendant's civil action, Case number 17-000191-CZ, and to dismiss Defendant's claims and issue appropriate sanctions.

D. Such monetary damages in excess of $75,000.00 to which the Court finds Plaintiff is justly entitled. (See Exhibit I, Answer & Counterclaims.)

E. For such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,


/s/ Elinor R. Jordan
By:  Elinor R. Jordan (MI P75651)
Sarah Prout Rennie (MI P58869)
Michigan Coalition to End Domestic
& Sexual Violence
Pro Bono Co-Counsel for Defendant
3893 Okemos Rd., Suite B2
Okemos, MI 48864-4209
(517) 347-7000 (ex. 10)

Dated:  July 17, 2017