# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-cv-12301 |
| | ) | |
| ARSENIY BAKHSHETSYAN, | ) | Hon. Victoria A. Roberts |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | _____ |

| | |
|---|---|
| Sarah Prout Rennie (MI P 58869) | David J. Kramer (MI P46342) |
| Elinor R. Jordan (MI P 75651) | 42400 Grand River Ave. Suite 109 |
| Michigan Coalition to End Domestic | Novi, MI 48375 |
| & Sexual Violence | (248) 348-7400 |
| Attorneys for Plaintiff | novi-law@wwnet.net |
| 3893 Okemos Rd., Suite B2 | |
| Okemos, MI 48864-4209 | |
| (517) 347-7000 | |
| ejordan@mcedsv.org | |
| sarah.proutrennie@mcedsv.org | |

_____

## Plaintiff's Response to Defendant's Motion to Dismiss

## Oral Argument Requested

**Plaintiff's Response to Defendant's Motion to Dismiss**

**Oral Argument Requested**

Plaintiff responds to Defendant's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) as follows:

1.      It is accurate that this action involves two people who have been University of Michigan MBA students.  Plaintiff has graduated from that program and Defendant is presently suspended because the University has found in two separate decisions that Defendant stalked Jane.

2.       The parties are former friends and intimate partners.

3.      Plaintiff, the University of Michigan, and the People of the State of Michigan, all allege that Defendant stalked her.

4.      It is accurate that Plaintiff reported Defendant's activity to the University of Michigan and to the Ann Arbor Police department.

5.      It is accurate that Plaintiff sought a personal protection order ("PPO") and sought protection and advice from the police.  The prosecutor's office of Washtenaw County, Michigan has brought aggravated felony charges based on Plaintiff's report and also based on the extensive investigation that ensued.  The district court found sufficient cause to bind the charges over to the state circuit court and the felony trial is believed to be set for the week of November 13, 2017. Importantly, Plaintiff is not the complaining witness on the charges.  Rather, the

investigating detective made that decision separately.  Plaintiff did not "convince" the authorities to file charges.  Likewise, although Plaintiff made a report with the University of Michigan regarding the stalking allegations in order to ensure she would be safe on campus, the Office of Institutional Equity investigated those reports pursuant to that Office's policies and, again, Plaintiff did not "convince" anyone to investigate Defendant.  Plaintiff simply cooperated with requests for information from the investigator.

6.    These statements are true.  Defendant's complaint before the Washtenaw County Circuit Court is detailed in and attached to Plaintiff's Complaint in this matter, ECF No. 1; Pg ID 8–9.

7.    It is true that, after Plaintiff had been subjected to a frivolous lawsuit by Defendant, she brought counterclaims and a request for sanctions against his attorney.  She also sought a PPO to ensure her safety because she continued to receive a barrage of spoof calls and vulgar, threatening texts.  Defendant untimely sought to terminate that PPO and aggressively resisted a motion to adjourn a full evidentiary hearing on the PPO until after the criminal trial because his attorneys wished to cross-examine Plaintiff.  Because of Defendant's tactical maneuvers, Plaintiff was forced to travel cross-country, appear in court, and be grilled by Defendant's attorney in order to keep her PPO.  After Plaintiff went through a grueling and intimidating hearing and incurred significant personal cost to travel,

3

the court not only denied to terminate the PPO as Defendant had requested, but instead, because of the serious nature of the evidence it had heard, the court decided to expand the PPO well beyond its original time limit.

8. In the various state-court civil cases, Defendant has, by his own admission, pursued discovery and hearings in order to further his attempts to discredit Plaintiff in furtherance of his criminal defense.

9. Plaintiff brought this action as a last resort in response to Defendant's litigation abuse and the Complaint speaks for itself.

10. Defendant has moved to dismiss this action and the reasons why that is improper are detailed in Plaintiff's attached brief.

11. Defendant's brief fails to take into consideration the case-by-case basis on which state action is to be assessed under Supreme Court precedent and instead incorporates wholesale abstractions from differing contexts in direct contradiction of the careful approach to such matters that the Supreme Court requires.

12. When properly analyzed, Defendant should be considered a state actor because he operated in bad faith to commandeer the state courts and took advantage of constitutionally deficient state-court procedures that fail to adequately guard crime victims' rights.

4

13.     Defendant's state-actor analysis is overly simplistic.  As detailed in Plaintiff's brief, because the Supreme Court mandates a detailed, case-by-case analysis of state action, mechanical application of prior case in the abstract is unhelpful.

14.     The *Rooker–Feldman* doctrine has no application here because Plaintiff complains of Defendant's commandeering of various state-court procedures and does not ask this court to review or alter any state-court ruling.

For these reasons, and those set forth in the attached brief, Plaintiff respectfully requests that this honorable Court DENY Defendant's motion to dismiss.

Respectfully submitted on September 25, 2017,

/s/ Elinor R. Jordan

Elinor R. Jordan (MI P 75651)

Michigan Coalition to End Domestic & Sexual Violence
Attorneys for Plaintiff
3893 Okemos Rd., Suite B2
Okemos, MI 48864-4209
(517) 347-7000
ejordan@mcedsv.org

**Proof of Service**

I, Elinor R. Jordan, hereby certify that on September 25, 2017, I

electronically filed the foregoing paper with the Clerk of the Court using the ECF

system which will send notification of such filing to attorney for Defendant, David

Kramer.  I also mailed a chambers copy to the Court via first class mail.

        /s/ Elinor R. Jordan
        By:  Elinor R. Jordan (MI P 75651)
        Michigan Coalition to End Domestic
        & Sexual Violence
        Pro Bono Co-Counsel for Defendant
        3893 Okemos Rd., Suite B2
        Okemos, MI 48864-4209
        (517) 347-7000

Dated: September 25, 2017

# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-cv-12301 |
| | ) | |
| ARSENIY BAKHSHETSYAN, | ) | Hon. Victoria A. Roberts |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | _____ |

Sarah Prout Rennie (MI P 58869)
Elinor R. Jordan (MI P 75651)
Michigan Coalition to End Domestic
& Sexual Violence
Attorneys for Plaintiff
3893 Okemos Rd., Suite B2
Okemos, MI 48864-4209
(517) 347-7000
ejordan@mcedsv.org
sarah.proutrennie@mcedsv.org

David J. Kramer (MI P46342)
42400 Grand River Ave. Suite 109
Novi, MI 48375
(248) 348-7400
novi-law@wwnet.net

_____

**Plaintiff's Brief in Response to Defendant's Motion to Dismiss**

**Oral Argument Requested**

**Issues presented**

1. Whether Defendant operated under color of law when, in bad faith, he commandeered state-court procedures that lack adequate protections for crime victims during the pendency of a criminal trial.


2. Whether, in keeping with the *Rooker–Feldman* doctrine, this Court may consider an action that challenges Defendant's abuse of state-court procedures that lack adequate constitutional protections.

## Most appropriate authority

Although each case assessing state action must be made independently, the most instructive cases on that issue are *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) and *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991).

With regard to the proper application of the *Rooker–Feldman* doctrine, the most instructive case is *Exxon Mobil Corporation v. Saudi Basic Industries Corporation*, 544 U.S. 280 (2005).

# Table of Contents

Table of Contents ................................................................................... iii

Index of Authorities ............................................................................... iv

I.   Factual Background ........................................................................... 1

II.   A motion to dismiss should be denied unless the plausible facts do not state a claim for relief ............................................................................... 2

III.   Defendant acted under color of law. ............................................... 3

A.   Action under color of law must be assessed on a case-by-case basis. ............ 3

B.   Case law provides guiding principles to the color-of-law inquiry. ................. 5

i.   While mere resort to courts is not enough, such decisions cannot be applied reflexively. ............................................................................... 9

ii.   The nexus test has emerged as one example of state action where an act is symbiotic with state authority ........................................................ 11

C.   A fact-bound consideration of the circumstances suggests that litigation abuse against a crime victim during the pendency of a prosecution gives rise to state action. ........................................................................... 12

i.   Michigan's procedures delegate expansive authority to litigants with insufficient protections for the rights of crime victims. ..................... 12

ii.   Defendant relied on the courts to continue harassing Jane. ...................... 16

iii.   This harassing behavior was aggravated by the air of legitimacy that state authority provided .................................................................. 18

iv.   Defendant acted in bad faith .................................................. 21

IV.   *Rooker-Feldman* doctrine has no application to this case ........................... 22

V.   Conclusion ..................................................................................... 24

# Index of Authorities

## Cases

*Adickes v. Kress & Co.*, 398 U.S. 144 (1970)............................................................5, 8

*American Manufacturers Mutual Insurance Company v. Sullivan*, 526 U.S. 40 (1999)........................................................................................................................9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).......................................................................3

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) ....................................................2, 3

*Blum v. Yaretzky*, 457 U.S. 991 (1982)......................................................................5

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961)..........................4, 11

*Chao v. Fleming*, 498 F. Supp. 2d 1034 (W.D. Mich. 2007) ...................................13

*Comstock v. Aber*, 212 Cal. App. 4th 931 Cal. Rptr. 3d 589 (2012)......................15

*Edmonson v. Leesville Concrete Company*, 500 U.S. 614 (1991)................... passim

*Ellison v. Garbarino*, 48 F.3d 192 (6th Cir. 1995) ...................................................4

*Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680 (S.D.N.Y. 2004) .....................15

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005).............. ii, 23

*Gable v. Lewis*, 201 F.3d 769 (6th Cir. 2000) .........................................................15

*Gottfried v. Med. Planning Servs., Inc.*, 280 F.3d 684 (6th Cir. 2002) .......... 8, 9, 21

*Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974) .............................................4, 5

*Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 606 F.3d 301 (6th Cir. 2010) .............................................................................................................24

*Lance v. Dennis*, 546 U.S. 459 (2006)....................................................................23

*Landis v. No. Am. Co.*, 299 U.S. 248 (1936) ..........................................................13

*Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir. 2000) ....................................11

*Lott v. Andrews Ctr.*, 259 F. Supp. 2d 564 (E.D. Tex. 2003) ..................................15

*Louisville Area Inter-Faith Comm. for United Farm Workers v. Nottingham Liquors, Ltd.*, 542 F.2d 652 (6th Cir.1976) ..........................................................8

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ........................................ passim

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) ............................ 20, 21

*Sanders v. Prentice-Hall Corp.*, 178 F.3d 1296 (6th Cir. 1999) ............................11

*Smith v. Hilltop Basic Res., Inc.*, 99 F. App'x 644 (6th Cir. 2004).........................10

*Sniadach v. Family Finance Corp.*, 395 U.S. 337 (1969) .........................................6

*Tahfs v. Proctor*, 316 F.3d 584 (6th Cir. 2003) ......................................................10

*Todd v. Weltman, Weinberg, & Reis Co., L.P.A.*, 434 F.3d 432 (6th Cir. 2006) ....24

*Westfield Partners, Ltd. v. Hogan*, 740 F. Supp. 523 (N.D. Ill. 1990)....................14

**Statutes**

18 U.S.C. § 1513 ..................................................................................13
18 U.S.C. § 1514 ..................................................................................13
18 USC § 3771 .....................................................................................12
20 U.S.C. § 1232 ..................................................................................16
42 U.S.C. § 1983 ........................................................................... passim
Mich. Comp. Laws 600.601 ................................................................15

**Rules**

Fed. R. of Civ. Pro. 8 ............................................................................2
Mich. Ct. Rule 2.302 .................................................................... 11, 12

**Constitutional Provisions**

Mich. Const. 1963 art. 5 § 3..................................................................16
Mich. Const. 1963, art. 1, § 24..............................................................11

**Other Authorities**

Digital Media Law Center, dmlp.org.....................................................16
Katrina Baum, *et al.*, *Stalking Victimization in the United States*, BUREAU J.
    STATS., Jan 2009 .............................................................................21
MJI Crime Victim Rights Benchbook 3d Ed § 1.6.................................13
*Protecting the Privacy of Student Education Records*, NAT'L CTR. EDUC.
    STATISTICS, Mar. 1997 ...................................................................18
Public Participation Project, anti-slapp.org .........................................16
*She called the man who sexually assaulted her a rapist. Then he sued her for
    defamation.* WASH. POST (Oct. 4, 2016) ..........................................15
*The Unequal Burden of Crime on America's Poor*, BROOKINGS INSTITUTE, April
    28, 2014.........................................................................................21

## I.      Factual Background

When Jane[1] tried to end an intimate relationship with Defendant, he would not take no for an answer.  During their initial breakup, Jane demanded in writing and in person more than twenty times that Defendant stop contacting her, but he continued to send hundreds of obsessive and threatening text messages.  He attempted to contact her through email and social media even after she blocked his number.  He showed up at her home multiple times after she had made it clear she did not want to see him.

Around this time Jane started to receive a steady stream of strange calls and terrorizing texts.  For instance, on October 11, 2016, Jane received a text that said she would "look even better with a broken jaw."  That message went on to state Jane's home address.  Then, on November 5, 2016, "Hello fat cunt. How have you been, fucking pig? Do you like living in fear?"  The barrage of texts and calls from unfamiliar numbers that appeared to be "spoofing"[2]—i.e., the stalking—continued for eight months.

After stalking Jane in person and over email, texts, and social media, Defendant turned to the courts.  As detailed in the Complaint, through various

---

[1]Plaintiff is referred to by her pseudonym, Jane Doe, pursuant to the Court's order.
[2] "Spoofing" occurs when a caller deliberately falsifies the information transmitted to your caller ID display to disguise their identity.  *Spoofing and Caller ID*, FEDERAL COMM. COMM'N, https://www.fcc.gov/consumers/guides/spoofing-and-caller-id (accessed September 25, 2017).

1

litigious actions, Defendant commandeered the Michigan courts and turned them into a three-dimensional chess board through which he continued to harass and intimidate Jane. This was possible only because Michigan lacks some of the most basic protections for crime victims like Jane.

Specifically, the Complaint details how Defendant: (1) brought a bogus lawsuit to intimidate Jane, Compl. 8–10; ECF No. 1; Page ID 8–10; (2) abused the liberal state-court discovery process to further harass Jane and gain information for his criminal case, *id.*; (3) aggressively resisted a stay in the civil suit for no good-faith reason, *id.*; and (4) misused the hearing afforded to him in personal protective order ("PPO") proceedings, *id.*

This Court was given a first-hand view of Defendant's litigation abuse. Just days after he was served with this lawsuit, Defendant sought to improperly subpoena Jane's deposition. *See* Exhibit B to Motion to Quash, Pg ID 140–44. Fortunately, this Court stopped him.

## II. A motion to dismiss should be denied unless the plausible facts do not state a claim for relief.

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." If the factual allegations are sufficient to "state a claim to relief that is plausible on its face," then the motion should be denied. *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard is not akin to a "'probability

2

requirement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that . . . recovery is very remote . . . ." *Twombly*, 550 U.S. at 556. This case should not be dismissed.

### III.    Defendant acted under color of law.

This case asks the Court to decide whether bad-faith commandeering of inadequate state-court procedures is action "under color of law" when the target is a crime victim and a criminal trial is pending. More plainly: does a stalker get to use the courts to continue stalking and harassing his victim? A finding of state action here is well supported by existing case law and is the only way that perpetrators will be stopped from continuing to harass crime victims via the courts.

### A. Action under color of law must be assessed on a case-by-case basis.

The Supreme Court has noted that, in enacting section 1983, "Congress thought it was creating a remedy as broad as the protection that the Fourteenth Amendment affords the individual." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 934 (1982). The law's purpose was "the enforcement . . . of the Constitution on behalf of every individual citizen of the Republic . . . ." *Id.* (internal citation omitted). A section 1983 lawsuit requires evidence of deprivation of a right secured by the Constitution or laws of the United States caused by the State or a person acting "under color of state law." *Ellison v. Garbarino*, 48 F.3d 192, 194

(6th Cir. 1995). Jane has alleged that Defendant violated her constitutional rights to privacy and freedom of speech under color of law.

Private persons may act under color of law for section 1983 purposes. A private party can fairly be said to be a state actor if (1) the deprivation complained of was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible" and (2) the offending party "acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Lugar*, 457 U.S. at 937.

Determining whether specific conduct constitutes state action "frequently admits of no easy answer." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974). "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Lugar*, 457 U.S. at 939 (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 721 (1961)). Although many scenarios have been deemed attributable to the state, there is no definite list of contexts in which private action can be attributed to the state—just as the Supreme Court intended. *See id.* The Court has recognized several possible tests, but has also observed that such tests are likely just "different ways of characterizing the necessarily fact-bound inquiry" to determine whether action can be fairly attributed to the state. *Id.*

4

Courts should not use a "mechanical" application of the tests that have emerged to find state action. *Roberts v. Louisiana Downs, Inc.*, 742 F.2d 221, 224 (5th Cir. 1984) (citing *Blum v. Yaretzky*, 457 U.S. 991, 1004 (1982)). "State action may manifest itself in a wide variety of forms, some of which do not fit neatly in any category." *Id.* As the Supreme Court noted, "differences in circumstances beget differences in law." *Jackson*, 419 U.S. at 358.

### B. Case law provides guiding principles to the color-of-law inquiry.

Instead of reflexively applying tests, courts should draw from the lessons of case law when private litigants are accused of acting under color of law. *See, e.g.*, *Jackson*, 419 U.S. at 358. Accordingly, the origins of the Supreme Court's application of section 1983 to private individuals merits a closer look. In *Adickes v. Kress & Co.*, a group of black and white customers was refused service at the Kress Store because of their racial makeup. 398 U.S. 144 (1970). The Court held proof of a conspiracy between the restaurant and local police to prevent blacks from being served would suffice as action under color of law for section 1983. *Id.* at 170. Subsequent case law broadened that definition.

In *Lugar*, the Court clarified that no conspiracy is required to assert action under color of law. 457 U.S. at 936. There, a truck stop owner was indebted to its supplier. *Id.* at 925. The supplier followed state procedures to obtain a prejudgment attachment of Lugar's property. *Id.* The prejudgment attachment

5

procedure provided very little protection to debtors.  *Id.*  More than a month after Lugar's property was levied, a state trial judge finally ordered the attachment dismissed because the supplier had not established proper statutory grounds for attachment.  *Id.*

In deciding *Lugar*, the Supreme Court rejected the Tenth Circuit's assumption that, because there was no conspiracy, there was no action under color of law.  457 U.S. at 937.  Even though the supplier correctly utilized an existing legal procedure and the clerk did not collude with the supplier to violate the debtor's rights, the supplier may have acted under color of law.  *Id.* at 942.  This decision built on a long line of precedent in which the Court found that creditors who utilized deficient state replevin processes to obtain debtors' property were acting under color of law.  *Id.* at 933 (citing, *e.g.*, *Sniadach v. Family Finance Corp.*, 395 U.S. 337 (1969)).  In such cases, the Court has held that "private use of the challenged state procedures with the help of state officials constitutes state action for purposes of the Fourteenth Amendment."[3]  *Id.*

Reliance on governmental assistance as state action was further developed in *Edmonson v. Leesville Concrete Company*, which arose out of a personal injury

---

[3] Although the holding in *Lugar* was specific to prejudgment garnishment, *see Lugar fn* 21, all state-action inquiries are "necessarily fact bound."  Plaintiff submits that the facts of this case present an issue of first impression, i.e., whether an alleged perpetrator who utilizes state courts to harass a crime victim during the pendency of his criminal trial is acting under color of law.

6

lawsuit where a black construction worker sued his employer over a jobsite accident. 500 U.S. 614, 617 (1991).   During *voire dire*, the employer used two of its three peremptory challenges to remove black persons from the prospective jury and the court denied the employee's request to require the employer to give a race-neutral reason for the challenges.  *Id.* The Court, building on the *Lugar* principles, reasoned that by relying on a government-created system for jury selection, the litigant acted under color of law.[4]  *Id.* at 623.  In short, abusing inadequate state procedures created state action.

The *Edmonson* Court explained that an element of the state-action inquiry should be "whether the injury caused is aggravated in a unique way by the incidents of governmental authority . . . ." *Id.*  In turn, the Court highlighted how court procedures are deeply embedded in and built upon state authority, and how an injustice carried out in a courtroom or in the context of a legal proceeding is compounded by the court's imputed legitimacy.  *Id.* at 628.  This is true because, "Few places are a more real expression of the constitutional authority of the government than a courtroom, where the law itself unfolds. Within the courtroom, the government invokes its laws to determine the rights of those who stand before

---

[4] The Court distinguished *Polk County v. Dodson*, 454 U.S. 312 (1981), where it had found public defenders are not state actors because of their participation in litigation, from *Edmonson* by noting that that a public defender's relationship with the state was "otherwise adversarial in nature." *Id.* at 626.

7

it." *Id.* So, to permit a constitutional deprivation in the context of the courts necessarily "compounds" the injury. *Id.*

*Lugar* and *Edmonson* make it clear that it matters deeply whether the state court has inculcated constitutionally deficient procedures. Where an actor takes advantage of inadequate procedures, such action can properly be described as "acting in concert" with state authorities. *Cf. Adickes* 398 U.S. at 220 (Black, J., concurring) (stating that section 1983 "would be read too narrowly if it were restricted to acts of state officials and those acting in concert with them."). It can also be conceptualized as a commandeering of the state courts, which is the term Jane has used.

The Sixth Circuit has added that whether a party acted in good faith is pertinent to the inquiry. *Gottfried v. Med. Planning Servs., Inc.*, 280 F.3d 684, 692 (6th Cir. 2002). For instance, when picketers sued an abortion clinic under section 1983 after the clinic called police to stop their protest, the court observed that the picketers had made no allegation that the clinic acted in bad faith when it used a state actor to stop their speech. *Id.* (citing *Louisville Area Inter-Faith Comm. for United Farm Workers v. Nottingham Liquors, Ltd.*, 542 F.2d 652, 655 (6th Cir.1976) (finding it pertinent that a party did not allege action in bad faith "with knowledge that an ex parte restraining order would be unconstitutional, or with any improper cause")). When a party avails him or herself of a state proceeding in bad

8

faith—particularly a procedure that lacks sufficient safeguards to protect

constitutional rights of others—such a party does so under color of law.

Ultimately, the question is "whether a private litigant in all fairness must be

deemed a government actor." *Edmonson*, 500 U.S. at 621. In determining the

answer, courts should weigh, among other possible considerations, (1) the

constitutional adequacy of state protections against deprivation of rights, *Lugar*,

457 U.S. at 933; (2) the extent to which the actor relied on governmental assistance

and benefits *Edmonson*, 500 U.S. at 621–22; (3) whether the involvement of

government authority aggravated the injury, *id.*; and (4) whether the private actor

accessed state proceedings in bad faith, *Gottfried*, 280 F.3d at 692. Applying this

analysis to the facts at hand, it is clear that dismissal—especially at this early

stage—is inappropriate.

### i.   While mere resort to courts is not enough, such decisions cannot be applied reflexively.

As a general matter, individuals do not automatically become state actors

when they resort to the state courts.[5] *See generally Am. Mfrs. Mut. Ins. Co. v.*

*Sullivan*, 526 U.S. 40, 54 (1999). But that is not all that happened here.

---

[5]*See also, e.g.*, *Hahn v. Star Bank*, 190 F.3d 708 (6th Cir.1999) (finding no state action where an attorney issued a subpoena seeking private financial information in the context of a construction dispute, relying on, *e.g.*, *Hoai v. Vo*, 935 F.2d 308, 313 (D.C.Cir. 1991) (finding that "mere recourse to state or local court procedures does not by itself constitute 'joint activity' with the state")).

9

The cases analyzing "mere resort" to the courts do not consider bad-faith commandeering of inadequate state-court procedures.  Nor did they involve the deprivation of a crime victim's rights.  For instance, in the case primarily relied upon by Defendant, *Tahfs v. Proctor*, 316 F.3d 584 (6th Cir. 2003), the 1983 plaintiff made a generalized claim that court staff had acted "corruptly" along with the defendants to obtain a PPO, and that the immediate effect of the PPO automatically gave rise to state action.  *Id.  Tahfs* involved only one venue of state-court action, instead of three.  *See id.*  More importantly, the court in *Tahfs* did not consider a challenge to the constitutional adequacy of the state-court procedures. *Id.* at 593.

Simply issuing a subpoena or winning a discovery dispute does not spontaneously convert a litigant into a state actor.[6]  But there is nothing simple about what happened in this case.  In the necessarily fact-bound inquiry that is

---

[6] Similarly in an unpublished case, the plaintiff argued a mining company became a state actor by issuing a subpoena and then arguing against a protective order. *Smith v. Hilltop Basic Res., Inc.*, 99 F. App'x 644, 645 (6th Cir. 2004).  The court held that merely arguing against a protective order was not enough to make the private company a state actor.  *Id.* The court expressed concern that to rule otherwise would mean every party that wins a discovery dispute would become a state actor for purposes of § 1983.  *Id.* at 648–49.  To be clear, this is not the result that Jane seeks.  Instead, Jane submits that as applied to crime victims (and especially victims of relational crimes), during the pendency of a criminal prosecution, the Michigan civil court rules do not adequately protect crime victims' civil rights. No such facts were present in *Hilltop* or *Hahn*, and research does not produce a case on point addressing this situation. *Id.* at 648.

10

required to determine state action, these prior cases have little bearing where, as here, a private litigant took advantage of constitutionally deficient procedures in bad faith to harass a crime victim during the pendency of a criminal trial.

### ii. The nexus test has emerged as one example of state action where an act is symbiotic with state authority.

Although "state action inheres in concrete situations, not in generalizations," a review of the so-called "nexus" test is instructive. *See Roberts*, 742 F.2d at 228. The Sixth Circuit has acknowledged there is "no clear standard for identifying a 'sufficiently close nexus'" but rather, such a finding "can be determined only in the framework of the peculiar facts or circumstances present." *Lansing v. City of Memphis*, 202 F.3d 821, 830 (6th Cir. 2000) (citing *Burton*, 365 U.S. at 726).

That said, a nexus may be found where there is a "symbiotic relationship" between the actor and the state. *Sanders v. Prentice-Hall Corp.*, 178 F.3d 1296 (6th Cir. 1999). For example, the Sixth Circuit found no nexus where peace officers assisted a private festival in asking a street preacher to leave fairgrounds because it constituted a "mere request for assistance." *Lansing*, 202 F.3d at 832–34. By contrast, the Fifth Circuit did find a nexus where a state's statutory framework delegated significant state authority to a private individual. *Roberts*, 742 F.2d at 226. In *Roberts*, a horse trainer sued a racetrack over stalling privileges. *Id.* The court held the racetrack's denial was state action because of the control delegated to a track secretary, who answered to both the state and the

11

track owners based on an extensive, state-created regulatory framework. *Id.* The nexus cases teach that rare factual scenarios may give rise to state action where, through a delegation of power to a private actor, that actor takes on state authority or the imprimatur of the state. *See id.* at 226.

### C. A fact-bound consideration of the circumstances suggests that litigation abuse against a crime victim during the pendency of a prosecution gives rise to state action.

Refraining from the temptation to mechanically apply abstract tests or categorical rules, it becomes clear that Defendant acted under color of law. Indeed, several factors from case law favor state action in this limited context.

### i. Michigan's procedures delegate expansive authority to litigants with insufficient protections for the rights of crime victims.

This is not a case in which a party merely resorted to the courts. Defendant intentionally commandeered state-court processes that are not designed to protect crime victims despite the fact that victims have legally cognizable rights. Defendant's actions were only possible because of deficiencies in Michigan's court rules and procedures. Specifically, Michigan's civil procedures are inadequate because they (1) contain no safety valve to the ordinary, liberal discovery rules for crime victims sued during the pendency of a criminal trial; (2) lack protection for victims of strategic lawsuits against public participation; and (3) create nearly zero protections for witnesses who are intimidated via a lawsuit.

12

Unfortunately, Michigan's civil discovery procedure lacks any protection for crime victims who are sued.  Michigan has adopted a liberal discovery practice.[7] *See* Mich. Ct. Rule 2.302(B)(1).  Specifically, the applicable rule sanctions discovery "regarding any matter, not privileged, which is relevant to the subject matter . . . ."  *Id.*  Though parties may seek protective orders, such orders will only issue when the court finds that, with regard to the "information sought," discovery would cause "annoyance, embarrassment, oppression, or undue burden or expense."  Mich. Ct. Rule 2.303(C).  But when the item sought to be discovered appears innocuous, there is no specific procedure to stop it from being discovered.[8]

Michigan's witness intimidation statute also fails to create a safe harbor for crime victims who are sued.  A defamation lawsuit against a crime victim during the pendency of a criminal trial in which she is the main witness is inherently

---

[7] Paradoxically, Michigan's criminal law supplies ample protections to crime victims attendant to criminal cases.  To begin with, the Michigan Constitution provides crime victims with "[t]he right to be treated with fairness and respect for their dignity and privacy throughout the criminal justice process." Mich. Const. 1963, art. 1, § 24.  More specifically, the Michigan Crime Victim Rights Benchbook advises that courts "mitigate the psychological effects of victimization" by avoiding "insensitive treatment of crime victims . . . ."  MJI Crime Victim Rights Benchbook 3d Ed § 1.6. Also under federal law, crime victims have the right to be treated with fairness and with respect for the victim's dignity and privacy and the right to be reasonably protected from the accused.  18 USC § 3771.
[8] There is also no automatic stay of civil proceedings where an attendant criminal proceeding is under way, and unlike the federal context, virtually no state case law governing when such a stay is appropriate. *See Chao v. Fleming*, 498 F. Supp. 2d 1034, 1037 (W.D. Mich. 2007) (citing *Landis v. No. Am. Co.*, 299 U.S. 248, 254–55 (1936)).

13

intimidating.  But Michigan's witness intimidation statute allows "communication regarding the otherwise lawful access to courts . . . such as the otherwise lawful filing of any civil action . . . of which the purpose is not to harass the other person."  Mich. Comp. Laws § 750.122(12)(b).  This limitation means that, unless the crime victim can prove that the lawsuit was motivated to harass her, Michigan law does not protect her.[9]

Michigan has also lacks a simple, widely-adopted safeguard for crime victims who are sued, i.e., explicit protection regarding strategic lawsuits against public participation ("SLAPPs").  Several courts have noted with concern the rise of SLAPPs.[10]  *E.g. Westfield Partners, Ltd. v. Hogan*, 740 F. Supp. 523, 524–25 (N.D. Ill. 1990) (stating, "The court perceives this, with a great deal of alarm, as part of a growing trend of what have come to be known as 'SLAPP suits.'").  For crime victims, SLAPP lawsuits generally look much like the one in this case—

---

[9] By contrast, federal law provides stiff penalties for more encompassing forms of witness intimidation, including interfering with the career of a witness.  18 U.S.C. § 1513(e).  Federal judges trying a criminal case may also issue broad protective orders to head off any harassment of a witness.  18 U.S.C. § 1514.  The definition of harassment in the federal context includes any conduct that "causes substantial emotional distress" and "serves no legitimate purpose."  18 U.S.C. § 1514(c).

[10] The rise in retaliatory lawsuits against crime victims has also been noted by the press.  *See, e.g.*, *She called the man who sexually assaulted her a rapist. Then he sued her for defamation.* WASH. POST (Oct. 4, 2016), https://www.washingtonpost.com/news/post-nation/wp/2016/10/03/i-felt-re-victimized-woman-sued-for-referring-to-the-man-who-sexually-assaulted-her-as-a-rapist/?utm_term=.c31dc5d22de5.

14

sham incantations of common-law torts that are designed to chill petitioning activity.[11] *Comstock v. Aber*, 212 Cal. App. 4th 931, 151 Cal. Rptr. 3d 589 (2012) (granting special motion to strike defamation and intentional infliction of emotional distress claims against a victim of sexual harassment). Twenty-eight states and the District of Columbia have enacted legislation that allows individuals who are sued to move to strike retaliatory pleadings or bring a specific countersuit against the plaintiff addressing the constitutional violations.[12]  Such "anti-SLAPP" laws serve as a deterrent and safety valve against a suit that seeks to harass crime victims.  Without this basic protection, Michigan crime victims are sitting ducks for SLAPPs.

The lack of safeguards for crime victims in Michigan's civil litigation procedures create a loophole whereby any criminal defendant with the financial means to do so could easily intimidate, harass, and bully his victim to discourage

---

[11] First Amendment petitioning activity includes reporting criminal conduct, filing a criminal complaint with law enforcement, and assisting law enforcement with investigation.  *See, e.g., Gable v. Lewis*, 201 F.3d 769, 771 (6th Cir. 2000) (noting that clearly "[s]ubmission of complaints and criticisms to nonlegislative and nonjudicial public agencies like a police department constitutes petitioning activity protected by the petition clause"); *Estate of Morris ex. rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 692 (S.D.N.Y. 2004) (stating that "it is axiomatic that filing a criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right to 'petition government for the redress of grievances.'") (quoting *Lott v. Andrews Ctr.*, 259 F. Supp. 2d 564, 568 (E.D. Tex. 2003).
[12] Digital Media Law Center, dmlp.org (accessed Sept. 15, 2017); Public Participation Project, https://anti-slapp.org/your-states-free-speech-protection/ (accessed Sept. 20, 2017).

15

her from cooperating in the criminal process, the result of which is a violation of victims' constitutional right to seek redress of government. Just as inadequate safeguards against replevin and racial bias in jury selection have given rise to state action, Defendant acted under color of law. *See Lugar*, 457 U.S. at 937; *Edmonson*, 500 U.S. at 621.

> ### ii.   Defendant relied on the courts to continue harassing Jane.

Without the state courts, Defendant would be without a forum and instrument to continue harassing Jane. The courts were a but-for cause of Jane's injuries. This reliance on the courts renders Defendant's actions to have occurred under color of state law.

In *Edmonson*, *supra*, which involved racially-charged jury selection, the Court reasoned the litigant's reliance on a government-created system of jury selection, which was built upon rules, memoranda, and statutes—all of which came from the state—converted the defendant into a state actor. 500 U.S. at 623. The Court explained that, "The selection of jurors represents a unique governmental function delegated to private litigants by the government and attributable to the government for purposes of invoking constitutional protections against discrimination by reason of race." *Id.* at 627.

Likewise here, the Michigan Court rules create civil discovery and the PPO process, with approximately twenty-five attendant rules. *See* Mich. Ct. Rules Chs.

16

2.300, 3.700.  Michigan's Revised Judicature Act of 1961 creates and endows the circuit courts with jurisdiction to direct civil discovery and to grant and hear motions on PPOs.  *See generally* Mich. Comp. Laws 600.601 *et seq.*  The Michigan Constitution gives the State Court Administrative Office the power to create forms that have the force of law when properly executed.  Mich. Const. 1963 art. 5 § 3.  The design of that system is to delegate and deputize state court litigants the power to collect evidence to aid the court in the fact-finding process.

The Complaint sets forth that Defendant engaged in discovery of Jane's grades, which was related to Defendant's prior harassment of Jane and his threats to ruin her career.  Compl. at 9; ECF No. 1; Pg ID 9.  With regard to this discovery abuse, Defendant needed the courts to be able to accomplish his harassment. Without an explicit court order, the University was not permitted to provide Jane's grades to Defendant.  The Family Educational Rights and Privacy Act, ("FERPA") protects student education records through "one of the nation's strongest privacy protection laws."[13] Specifically, FERPA protects privacy of school records by precluding disclosure without the student's consent or a court order (among few other exceptions).  20 U.S.C. § 1232(g).  When it denied Jane's request for a protective order to prevent disclosure of her academic records, the state court cited

---

[13] *Protecting the Privacy of Student Education Records*, Nat'l Ctr. Educ. Statistics, Mar. 1997, https://nces.ed.gov/pubs97/web/97859.asp.

the liberal discovery rules and noted that grades are not particularly intimate in nature. The court then explicitly ordered the University to turn over the records. Without that court order, the University could not have relinquished Jane's grades under FERPA.

Defendant also relied upon the hearing afforded to Defendant through the PPO rules, in order to force Jane to travel cross-country to appear in a courtroom where he could sit and watch Jane be grilled by his attorney. *See* Mich. Ct. Rule 3.707(A)(2). Using the courts was the only way that Defendant could assert such control over Jane. Ultimately, the state court ruled in Jane's favor and concluded that an extension (as opposed to a termination) of the PPO was appropriate. Nonetheless, Defendant got just what he wanted—another chance to bully Jane.

While you can block someone on Facebook,[14] and even on your phone,[15] you cannot "block" a civil case. Because Defendant had run out of ways to harass Jane, he commandeered the courts. Defendant relied on the state to carry out a deprivation of Jane's rights.

> iii. **This harassing behavior was aggravated by the air of legitimacy that state authority provided.**

---

[14] *Help*, FACEBOOK, https://www.facebook.com/help/168009843260943 (accessed Sept. 20, 2017).
[15] *Support*, VERIZON WIRELESS, https://www.verizonwireless.com /support/knowledge-base-20989/ (accessed Sept. 20, 2017).

18

Defendant's harassing behavior had a greater impact when he was able to bully Jane under the imprimatur of the court. As the Supreme Court has observed, "the courtroom is a real expression of the government's constitutional authority," and a deprivation of rights "in this official forum compounds" an injury. *Edmonson*, 500 U.S. at 628.

While going about her business as a student, Jane was approached by a process server who placed an official State of Michigan form, the summons and complaint, in her hands. The summons states (as it must per court rule 2.102) "In the name of the people of the State of Michigan you are notified . . . You are being sued."[16] For anyone, this would be unsettling or even terrifying by virtue of its connection to state authority. Had this been yet another intrusive and disgusting message, perhaps Jane could have momentarily brushed it aside and focused on her studies. But Defendant chose to use the courts to harass her because it forced her to pay attention.

The chilling effect of civil litigation against crime victims has not been lost on the federal courts. The Sixth Circuit has observed that exposing crime victims to lawsuits—and specifically "the discovery, depositions, hearings, trials, and other proceedings that attend civil actions"— creates "a substantial disincentive for

---

[16] *Summons*, STATE COURT ADMIN. OFFICE, http://courts.mi.gov/administration/scao/forms/courtforms/mc01.pdf (accessed Sept. 20, 2017).

victims to come forward to identify their attackers." *Moldowan v. City of Warren*, 578 F.3d 351, 373 (6th Cir. 2009). The court continued, "That concern, in turn, implicates the effective administration of the criminal justice system, which is undoubtedly a weighty public interest." *Id.* This is particularly problematic in the context of a victim of a relational crime. *See id.* As the Sixth Circuit recognized in the context of a sexual assault victim, "the threat of being dragged through the rigors of a civil suit . . . would create a tremendous emotional hardship." *Id.* Similarly here, if defendants of relational crimes are permitted to routinely sue the person accusing them for defamation with inadequate safeguards, the harassment will be especially damaging and will chill victims' redress.

There is already extensive evidence that stalking is profoundly underreported.[17] It also bears mentioning that the use of the courts as a forum for harassment is especially intimidating for poor and marginalized populations who are more likely to be the victims of crime and may lack resources to defend themselves from frivolous lawsuits.[18] To the extent that litigation abuse like that

---

[17] Katrina Baum, *et al.*, *Stalking Victimization in the United States*, BUREAU J. STATS., Jan 2009; *available at* https://victimsofcrime.org/docs/src/baum-k-catalano-s-rand-m-rose-k-2009.pdf?sfvrsn=0.

[18] *See, e.g.*, *The Unequal Burden of Crime on America's Poor*, BROOKINGS INSTITUTE, April 28, 2014, https://www.brookings.edu/blog/up-front/2014/04/28/the-unequal-burden-of-crime-and-incarceration-on-americas-poor/.

engaged in by Defendant interferes with any crime victim's comfort in reporting crime, that implicates a weighty public interest. *Moldowan*, 578 F.3d at 373.

### iv.    Defendant acted in bad faith.

Defendant acted in bad faith to commandeer state procedures, which also supports state action. *See, e.g.*, *Gottfried*, 280 F.3d at 692.  The Complaint explains that Defendant filed a frivolous lawsuit that was calculated to harass Jane, a main witness against Defendant in his criminal prosecution.   Compl. at 8–9; ECF No. 1; Pg ID 8–9.  There was no proper reason for Defendant to bring a civil action for defamation during the pendency of the criminal investigation and prosecution against him.  Michigan law provides a six-year statute of limitations for defamation claims. Mich. Comp. Laws 600.5813.  Indeed, given Defendant and his attorneys' handling of the suit, the only logical conclusion is that Defendant filed his lawsuit to harass Jane in hopes that her speech would be chilled.

For example, to protect Jane from further discovery intimidation during the pendency of the criminal trial, Jane's attorneys requested a stay.  Despite the obvious Fifth Amendment implications of continuing a civil lawsuit during the pendency of his own felony charges, Defendant bizarrely and aggressively contested that stay, resulting in piled-on litigation.  The circuit court agreed with Jane's attorneys that the criminal case must take precedence, and stayed the defamation lawsuit on July 26, 2017.  *See* Mot. for Prot. Or., Exh. A; ECF No. 2;

21

Pg ID 138–39.  Again, Defendant's objections to the stay made it clear that the lawsuit was instituted to intimidate Jane and to obtain expanded discovery—like a deposition of Jane—that could be used in the criminal case.

At best, Defendant's actions were in bad faith because they sought a loophole to expanded and improper discovery.  At worst, Defendant's actions sought to exploit inadequate state court protections for crime victims to harass Jane in hopes that she would discontinue her cooperation with the prosecution.  Either way, Defendant acted under color of law.

Simply put, in the narrow context presented in this case, i.e., because Jane is a crime victim during the pendency of a prosecution (and especially because the crime is relational in nature), Defendant acted under color of law when he commandeered, in bad faith, a constitutionally deficient state-court process for the purpose of continuing harassment and intimidation of Jane while a serious felony case was pending against him for stalking her.

### IV.    *Rooker-Feldman* **doctrine has no application to this case.**

The *Rooker–Feldman* doctrine raised in Defendant's brief is a red herring that should not deter this Court from hearing Plaintiff's claims.    Defendant's reliance on the doctrine is misplaced as nothing in Jane's complaint seeks to re-litigate state court matters.  Rather, Jane's case is about the misuse of state-court

processes to intimidate Jane as a witness in the felony stalking case against Defendant.

Jane does not seek relief from any one particular state-court decision, nor does she allege that the state courts got it wrong. The *Rooker–Feldman* doctrine "is confined to . . . cases brought by state-court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgment." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283-84 (2005). Indeed, Jane has "won" a stay in the state civil case over Defendant's vigorous objection and instead of dissolving her PPO as Defendant asked, the state court ultimately extended it by five years—another "win" for Jane. Mot. for Prot. Or. Exh. A; ECF No 2. Regardless, Jane's constitutional claims are significantly distinct and broader than any one state-court decision.

The Supreme Court has reiterated the narrowness of the *Rooker–Feldman* doctrine. *See, e.g.*, *id.*; *Lance v. Dennis*, 546 U.S. 459, 464 (2006). The Sixth Circuit explained the *Rooker–Feldman* doctrine applies only if "the source of the injury is the state court decision . . . ." *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006). Specifically, *McCormick* held that a 1983 litigant was not barred from asserting that state-court judgments "were procured by certain Defendants through fraud, misrepresentation, or other improper means, and that a

23

state statute is vague and overbroad." *Id.* at 392; *see also Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 606 F.3d 301, 310 (6th Cir. 2010) (finding no *Rooker–Feldman* in a challenge of litigant behavior, not the court's decision); *Todd v. Weltman, Weinberg, & Reis Co., L.P.A.*, 434 F.3d 432 (6th Cir. 2006) (holding that claim challenging the defendant's use of a false affidavit was separate from a challenge to the underlying state-court order allowing garnishment).

Like the plaintiff in *McCormick*, Jane is not "asserting an injury caused by the state court judgments . . . ." *Id.* Instead, Jane has alleged that Defendant is pursuing his litigation for improper purposes and is taking advantage of deficient state procedures that do not adequately protect crime victims' rights. These complaints are independent of the state courts' decisions. *Rooker–Feldman* does not apply.

### V.    Conclusion

After months of stalking and harassment, this Court is the only place Jane can go for redress for Defendant's misuse of the state courts to chill her rights as a crime victim. This is an issue of deep and important significance for the criminal justice system because, as the Supreme Court put it, "[f]ew places are a more real expression of the constitutional authority of the government than a courtroom, where the law itself unfolds. Within the courtroom, the government invokes its laws to determine the rights of those who stand before it." *Edmonson*, 500 U.S. at

24

628.  If this Court does not intervene, then it will tacitly send a message to

perpetrators: there is no safe harbor for crime victims in the arms of the criminal

justice system if they are sued concurrently.  Victims will stop reporting and

perpetrators will commandeer the courts to continue harassment with impunity.

Accordingly, Jane respectfully requests that this honorable Court deny Defendant's

motion to dismiss.

      Respectfully submitted on September 25, 2017,

            /s/ Elinor R. Jordan

            Elinor R. Jordan (MI P 75651)

            Michigan Coalition to End Domestic & Sexual Violence
            Attorneys for Plaintiff
            3893 Okemos Rd., Suite B2
            Okemos, MI 48864-4209
            (517) 347-7000
            ejordan@mcedsv.org

**Proof of Service**

I, Elinor R. Jordan, hereby certify that on September 25, 2017, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to attorney for Defendant, David Kramer.  I also mailed a chambers copy to the Court via first class mail.

> /s/ Elinor R. Jordan
> By:  Elinor R. Jordan (MI P 75651)
> Michigan Coalition to End Domestic
> & Sexual Violence
> Pro Bono Co-Counsel for Defendant
> 3893 Okemos Rd., Suite B2
> Okemos, MI 48864-4209
> (517) 347-7000

Dated: September 25, 2017

26